IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION


MICHAEL RUFFIN,
    Petitioner,

vs.                                               Case No.:  4:05cv368/MMP/EMT

JAMES R. McDONOUGH,
    Respondent.
_____/

### REPORT AND RECOMMENDATION

       Before the court is a petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 (Doc. 1).  Respondent filed a motion to dismiss the petition on the ground that the sole claim raised by Petitioner is procedurally barred (Doc. 10).  Alternatively, Respondent seeks denial of the petition on the merits (*id.*).  Petitioner filed a response (Doc. 14).  This matter is referred to the undersigned magistrate judge for report and recommendation pursuant to 28 U.S.C. § 636 and N. D. Fla. Loc. R. 72.2(b).  After careful consideration, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter.  It is further the opinion of the undersigned that the pleadings and attachments before the court show that Petitioner is not entitled to federal habeas relief.

I.    BACKGROUND

       On October 28, 1998, following a non-jury trial in the Circuit Court for Leon County, Florida, Petitioner was adjudicated guilty of armed robbery with a firearm (Doc. 10, Ex. A-1 at 14, 17, Ex. A-2 at 1, 74).  On December 2, 1998, Petitioner was sentenced to eleven (11) years of incarceration followed by three (3) years of probation (Doc. 10, Ex. A-1 at 17-24).  Petitioner appealed his conviction and sentence to the Florida First District Court of Appeals (First DCA) (Doc. 10, Ex. A-3).  His counsel raised one issue on appeal, that the State failed to present sufficient

evidence to support the conviction (Doc. 10, Ex. A3). The First DCA affirmed the conviction per curiam without opinion on October 11, 2000, with the mandate issuing October 27, 2000 (Doc. 10, Ex. A-5, Ex. A-6). Ruffin v. State, 769 So.2d 374 (Fla. 1st DCA October 11, 2000) (Table).

On April 3, 2001, Petitioner filed a motion for post-conviction relief, pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure, asserting several grounds of ineffective assistance of counsel (Doc. 10, Ex. B-1 at 53-128).[1] Following an evidentiary hearing at which Petitioner was represented by counsel (*see* Doc. 10, Ex. B-2 at 169-278), the trial court denied the post-conviction motion (Doc. 10, Ex. B-2 at 280-85). Petitioner appealed the decision to the First DCA, (Doc. 10, Exs. B-3, B-4, B-5). The First DCA affirmed the decision per curiam without opinion on December 14, 2004, with the mandate issuing December 30, 2004 (Doc. 10, Exs. B-6, B-7). Ruffin v. State, 894 So.2d 250 (Fla. 1st DCA Dec. 14, 2004) (Table).

On January 11, 2005, Petitioner filed a petition for writ of habeas corpus with the First DCA asserting several grounds of ineffective assistance of appellate counsel with regard to the presentation of issues on appeal of the decision denying his Rule 3.850 motion (Doc. 10, Ex. C-1). On March 14, 2005, the First DCA denied the petition on the merits (Doc. 10, Ex. C-3). Ruffin v. State, 895 So.2d 1276 (Fla. 1st DCA Mar. 14, 2005).

Petitioner filed the instant habeas action on September 23, 2005 (*see* Doc. 1 at 15). He challenges his conviction on the following ground:

> The trial court violated Petitioner's constitutional right to due process by failure to identify Petitioner as perpetrator of crime.

(Doc. 1 at 4).

Respondent concedes that the petition is timely, but argues that Petitioner failed to present his federal claim to the state courts and is now procedurally barred from doing so (Doc. 10 at 3-8). Furthermore, Respondent contends Petitioner is not entitled to review of his claim under the actual innocence exception to the procedural bar (*id*. at 3-5). Alternatively, Respondent argues that Petitioner's claim is without merit (*id*. at 8-15).

---

[1] References to pages of Exhibits B-1 and B-2 are to the page numbers appearing vertically in the bottom right of each page.

Case No.:  4:05cv368/MMP/EMT

II.     STANDARD OF REVIEW

Section 2254(a) of Title 28 provides, "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws of the United States." As the instant petition was filed after April 24, 1996, it is subject to the more deferential standard for federal habeas review of state court decisions under § 2254 as brought about by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA). Pub.L. 104-132, § 104, 110 Stat. 1214, 1218-19.

Section 2254 now provides:

(d)     An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
   (1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
   (2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254 (West Supp. 2001).

The United States Supreme Court explained the framework of review under § 2254(d)(1) in Williams v. Taylor, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).[2] The appropriate test in habeas cases was described by Justice O'Connor as follows:

In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court. Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied - the state court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as

---

[2]Unless otherwise noted, references to Williams are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529 U.S. at 367-375, 390-399, 120 S.Ct. at 1499-1503, 1511-1516); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas, and –-except as to the footnote – Scalia) in part II (529 U.S. at 403-413, 120 S.Ct. at 1518-1523). The opinion of Justice Stevens in Part II was joined by Souter, Ginsburg, and Breyer.

>determined by the Supreme Court of the United States." Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.*, 529 U.S. at 412-13; Ramdass v. Angelone, 530 U.S. 156, 120 S. Ct. 2113, 2119-20, 147 L. Ed. 2d 125 (2000).

The Eleventh Circuit has developed a three-step process for applying the Williams test to any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in a formal state court proceeding. *See* Wellington v. Moore, 314 F.3d 1256, 1260-61 (11th Cir. 2002); Robinson v. Moore, 300 F.3d 1320, 1343-45 (11th Cir. 2002). First, the court must ascertain the controlling legal principles that are clearly established by the Supreme Court at the time of the state court adjudication. Wellington, 314 F.3d at 1260; Robinson, 300 F.3d at 1343. Second, the court must determine whether the state court adjudication was contrary to the clearly established Supreme Court law. Wellington, 314 F.3d at 1260, Robinson, 300 F.3d at 1344. "The 'contrary to' clause in § 2254(d)(1) 'suggests that the state court's decision must be substantially different' from the relevant Supreme Court precedent." Wellington, 314 F.3d at 1260 (quoting Fugate v. Head, 261 F.3d 1206, 1216 (11th Cir. 2001), *cert. denied*, 535 U.S. 1104, 122 S. Ct. 2310, 152 L. Ed. 2d 1065 (2002) (quoting Williams, 529 U.S. at 405)). "Although a state court's decision that 'applies a rule that contradicts' the governing Supreme Court law is 'contrary,' a state court decision that applies 'the correct legal rule' based on Supreme Court law to the facts of the petitioner's case would not fit within the 'contrary to' clause even if the federal court might have reached a different result relying on the same law." Wellington, 314 F.3d at 1260 (citing and quoting Williams, 529 U.S. at 404-06). If the state court applied the correct Supreme Court precedent, and the United States Supreme Court, faced with materially indistinguishable facts, has not reached a decision different from the decision reached by the state court in the petitioner's case, the case does not fit within the "contrary to" clause, and the federal habeas court must proceed to the third step and determine whether the state court "unreasonably applied the relevant Supreme Court authority." Fugate, 261

F.3d at 1216.  Likewise, if the facts of the Supreme Court cases and the petitioner's case are not substantially similar, "a state court decision that applies 'the correct legal rule' based on Supreme Court law to the facts of the petitioner's case would not fit within the 'contrary to' clause even if the federal court might have reached a different result relying on the same law." *Id.* (citing and quoting Williams, 529 U.S. at 406).  A state court is not required to cite Supreme Court cases or even be aware of the cases, "so long as neither the reasoning nor the result of the state-court decision contradicts them."  Early v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 154 L. Ed. 2d 263 (2002).

The standard for an unreasonable application inquiry is "whether the state court's application of clearly established federal law was objectively unreasonable."  Williams, 529 U.S. at 410.  The Supreme Court has explained that "a federal habeas court may not issue a writ under the unreasonable application clause 'simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.'"  Bell v. Cone, 535 U.S. 685, 122 S. Ct. 1843, 1850, 152 L. Ed. 2d 914 (2002) (quoting Williams, 529 U.S. at 411).  Indeed, "[t]he gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness."  Lockyer v. Andrade, 538 U.S. 63, 123 S. Ct. 1166, 1175, 155 L. Ed. 2d 144 (2003).  A state court's incorrect application of clearly established law will be held to be reasonable and not warrant a writ unless "thorough analysis by a federal court produces a firm conviction that that [the state court] judgment is infected by constitutional error."  Williams, 529 U.S. at 389.  "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case by case determinations."  Yarborough v. Alvarado, 541 U.S. 652, 124 S. Ct. 2140, 2149, 158 L. Ed. 2d 938 (2004) (citation omitted).  Although § 2254(d)(1) is concerned only with federal law as clearly established by the Supreme Court, this court may look to circuit precedent to demonstrate reasonable applications of Supreme Court precedent.  Van Poyck v. Fla. Dep't of Corrections, 290 F.3d 1318, 1322 n.4 (11th Cir. 2002).

In deciding whether a state court decision involved "an unreasonable determination of the facts in light of the evidence presented in the state court proceeding" under § 2254(d)(2), determinations of fact are "presumed to be correct," unless the presumption is rebutted by Petitioner "by clear and convincing evidence."  Section 2254(e)(1); *see* Miller-El v. Cockrell, 537 U.S. 322,

Case No.:  4:05cv368/MMP/EMT

123 S. Ct. 1029, 1041, 154 L. Ed. 2d 931 (2003) ("Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding, § 2254(d)(2)." (dictum)); Fugate, 261 F.3d at 1215 (quoting 28 U.S.C. § 2254(e)(1)); Parker v. Head, 244 F.3d 831, 835-36 (11th Cir. 2001) (citing § 2254(d)(2) and (e)(1)); *see also* Crawford v. Head, 311 F.3d 1288 (11th Cir. 2002) (explaining that the new statute provides a "highly deferential standard of review" of the state court's factual determinations).  Thus, not only must the state court's factual determination have been unreasonable, but the court's factual findings must be shown unreasonable by clear and convincing evidence.  *See* Callahan v. Campbell, 427 F.3d 897, 926 (11th Cir. 2005) (citing § 2254(e)(1); Rutherford v. Crosby, 385 F.3d 1300, 1308 (11th Cir. 2004) (concluding that "[petitioner] has not shown by clear and convincing evidence that the Florida Supreme Court's factual finding . . . [wa]s unreasonable in light of the evidence in the state court record")).

III.     EXHAUSTION AND DEFAULT

It is a long-standing prerequisite to the filing of a federal habeas corpus petition that the petitioner have exhausted available state court remedies, 28 U.S.C. § 2254(b)(1),[3] thereby giving the State the "'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights."  Duncan v. Henry, 513 U.S. 364, 365, 115 S. Ct. 887, 888, 130 L. Ed. 2d 865 (1995) (quoting Picard v. Connor, 404 U.S. 270, 275, 92 S. Ct. 509, 30 L. Ed. 2d 438 (1971) (citation omitted)).  To satisfy the exhaustion requirement, the petitioner must "fairly present" his claim in

---

[3]Section 2254 provides, in pertinent part:

(b)(1)   An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that–
    (A)  the applicant has exhausted the remedies available in the courts of the State; or
    (B) (i)  there is an absence of available State corrective process; or
       (ii)  circumstances exist that render such process ineffective to protect the rights of the applicant.
. . . .
(c) An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.

each appropriate state court, alerting that court to the federal nature of the claim. Duncan, 513 U.S. at 365-66; O'Sullivan v. Boerckel, 526 U.S. 838, 845, 119 S. Ct. 1728, 144 L. Ed. 2d 1 (1999); Picard, 404 U.S. at 277-78.

       The Supreme Court has offered the following guidance for determining whether a habeas petitioner has met the "fair presentation" requirement. In Picard v. Connor, the Court held that, for purposes of exhausting state remedies, a claim for relief in habeas corpus must include reference to a specific federal constitutional guarantee, as well as a statement of the facts which entitle the petitioner to relief. 404 U.S. at 277. In announcing that "the substance of a federal habeas corpus claim must first be presented to the state courts," *id.*, 404 U.S. at 278, the Court rejected the contention that the petitioner satisfied the exhaustion requirement by presenting the state courts only with the facts necessary to state a claim for relief.

       Additionally, the Court has indicated that it is insufficient to make a general appeal to a constitutional guarantee as broad as due process to present the "substance" of such a claim to a state court. In Anderson v. Harless, 459 U.S. 4, 103 S. Ct. 276, 74 L. Ed. 2d 3 (1982), the habeas petitioner was granted relief on the ground that a jury instruction violated due process because it obviated the requirement that the prosecutor prove all the elements of the crime beyond a reasonable doubt. *Id.* 459 U.S. at 7 (citing Sandstrom v. Montana, 442 U.S. 510, 99 S. Ct. 2450, 61 L. Ed. 2d 39 (1979)). The only manner in which the habeas petitioner cited federal authority was by referring to a state court decision in which "the defendant . . . asserted a broad federal due process right to jury instructions that properly explain state law." Anderson, 459 U.S. at 7 (internal quotation marks omitted). The Court expressed doubt that a defendant's citation to a state-court decision predicated solely on state law was sufficient to fairly apprise a reviewing court of a potential federal claim merely because the defendant in the cited case advanced a federal claim. *Id.*, 459 U.S. at 7 and n.3. Furthermore, the Court clarified that such a citation was obviously insufficient when the record satisfied the federal habeas court that the federal claim asserted in the cited case was not the same as the federal claim on which federal habeas relief was sought. *Id.*

       Years later, the Supreme Court readdressed the "fair presentation" requirement in Duncan v. Henry, 513 U.S. 364. The Duncan Court strictly construed the exhaustion requirement so as to mandate that, if state and federal constitutional law overlap in their applicability to a petitioner's

claim, the petitioner must raise his issue in terms of the applicable federal right in state court in order to obtain federal review of the issue.[4] The Supreme Court explained, "[i]f a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal, but in state court." Duncan, 513 U.S. at 365-66. Recently, the Supreme Court again focused upon the requirement of "fair presentation," holding that "ordinarily a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion in the case, that does so." Baldwin v. Reese, 541 U.S. 27, 124 S. Ct. 1347, 1351, 158 L. Ed. 2d 64 (2004). The Baldwin Court commented that "a litigant wishing to raise a federal issue can easily indicate the federal law basis for his claim in a state-court petition or brief, for example, by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim 'federal.'" Id. With regard to this statement, the Eleventh Circuit stated in McNair v. Campbell, 416 F.3d 1291 (11th Cir. 2005):

> If read in a vacuum, this dicta might be thought to create a low floor indeed for petitioners seeking to establish exhaustion. However, we agree with the district court that this language must be "applied with common sense and in light of the purpose underlying the exhaustion requirement[:] 'to afford the state courts a meaningful opportunity to consider allegations of legal error without interference from the federal judiciary.'"McNair [v. Campbell], 315 F. Supp. 2d at 1184 (quoting Vasquez v. Hillery, 474 U.S. 254, 257, 106 S. Ct. 617, 620, 88 L. Ed. 2d 598 (1986)). This is consistent with settled law established by the Supreme Court. . . . We therefore hold that "'[t]he exhaustion doctrine requires a habeas applicant to do more than scatter some makeshift needles in the haystack of the state court record.'"

416 F.3d at 1302-03 (citations omitted).[5]

---

[4]The petitioner in Duncan raised a federal due process claim in his habeas petition, but had raised only a state constitutional claim in his state appeal. Presented with a state constitutional claim, the state court applied state law in resolving the appeal.

[5]In his initial brief before the Court of Criminal Appeals, the petitioner cited one federal case in a string citation containing other state cases, and in a closing paragraph in his argument that extraneous materials were considered by the jury during deliberations, stated that there was a violation of his rights "protected by the Fifth, Sixth, Eighth[,] and Fourteenth Amendments to the United States Constitution, the Alabama Constitution[,] and Alabama law." McNair v. Campbell, 416 F.3d 1291, 1303 (11th Cir. 2005). The court found that these references to federal law were not sufficient to meet the fair presentment requirement and noted that it was important that the petitioner had never mentioned the

An issue that was not properly presented to the state court and which can no longer be litigated under state procedural rules is considered procedurally defaulted, i.e., procedurally barred from federal review. O'Sullivan, 526 U.S. at 839-40, 848; Bailey v. Nagle, 172 F.3d 1299, 1302-03 (11th Cir. 1999). This court will also consider a claim procedurally defaulted if it was presented in state court and rejected on the independent and adequate state ground of procedural bar or default. *See* Coleman v. Thompson, 501 U.S. 722, 734-35 and n.1, 111 S. Ct. 2546, 2555 and n.1, 115 L. Ed. 2d 640 (1991); Caniff v. Moore, 269 F.3d 1245, 1247 (11th Cir. 2001) ("[C]laims that have been held to be procedurally defaulted under state law cannot be addressed by federal courts."); Chambers v. Thompson, 150 F.3d 1324, 1326-27 (11th Cir. 1998) (applicable state procedural bar should be enforced by federal court even as to a claim which has never been presented to a state court); *accord* Tower v. Phillips, 7 F.3d 206, 210 (11th Cir. 1993); Parker v. Dugger, 876 F.2d 1470 (11th Cir. 1990), *rev'd on other grounds*, 498 U.S. 308, 111 S. Ct. 731, 112 L. Ed. 2d 812 (1991). In the first instance, the federal court must determine whether any future attempt to exhaust state remedies would be futile under the state's procedural default doctrine. Bailey, 172 F.3d at 1303. In the second instance, a federal court must determine whether the last state court rendering judgment clearly and expressly stated its judgment rested on a procedural bar. *Id.*. A federal court is not required to honor a state's procedural default ruling unless that ruling rests on adequate state grounds independent of the federal question. *See* Harris v. Reed, 489 U.S. 255, 109 S. Ct. 1038, 1043, 103 L. Ed. 2d 308 (1989). The adequacy of a state procedural bar to the assertion of a federal question is itself a federal question. Lee v. Kemna, 534 U.S. 362, 122 S. Ct. 877, 885, 151 L. Ed. 2d 820 (2002). The Eleventh Circuit has set forth a three-part test to determine whether a state court's procedural ruling constitutes an independent and adequate state rule of decision. Judd v. Haley, 250 F.3d 1308, 1313 (11th Cir. 2001). First, the last state court rendering judgment must clearly and expressly state it is relying on state procedural rules to resolve the federal claim.[6] Second, the state court's decision on the procedural issue must rest entirely on state law grounds and

---

federal standards regarding extraneous materials in his brief, but relied on state law for his arguments. *Id.*

[6]The federal court should honor the procedural bar even if the state court alternatively reviewed the claim on the merits. Marek v. Singletary, 62 F.3d 1295, 1302 (11th Cir. 1995); Alderman v. Zant, 22 F.3d 1541 (11th Cir. 1994).

Case No.: 4:05cv368/MMP/EMT

not be intertwined with an interpretation of federal law. Third, the state procedural rule must be adequate. *Id.* The adequacy requirement has been interpreted to mean the rule must be firmly established and regularly followed, that is, not applied in an arbitrary or unprecedented fashion. *Id.*

To overcome a procedural default, the petitioner must show cause and prejudice or a fundamental miscarriage of justice in order for the federal habeas court to reach the merits of a claim. Tower, 7 F.3d at 210; Parker, 876 F.2d 1470. "For cause to exist, an external impediment, whether it be governmental interference or the reasonable unavailability of the factual basis for the claim, must have prevented petitioner from raising the claim." McCleskey v. Zant, 499 U.S. 467, 497, 111 S. Ct. 1454, 1472, 113 L. Ed. 2d 517 (1991) (quoting Murray v. Carrier, 477 U.S. 478, 488, 106 S. Ct. 2639, 2645, 91 L. Ed. 2d 397 (1986)). Lack of counsel or ignorance of available procedures is not enough to establish cause. Tower, 7 F.3d at 210. To satisfy the miscarriage of justice exception, the petitioner must show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." Schlup v. Delo, 513 U.S. 298, 327, 115 S. Ct. 85, 130 L. Ed. 2d 808 (1995). "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him." Schlup, 513 U.S. at 327. Further:

> a substantial claim that constitutional error has caused the conviction of an innocent person is extremely rare. To be credible, such a claim requires [a] petitioner to support his allegations of constitutional error with new reliable evidence -- whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence -- that was not presented at trial.

*Id.*

Within this framework, the court will review Petitioner's claim.

IV.   PETITIONER'S CLAIM

Petitioner claims that the trial court denied his due process rights by adjudicating him guilty without sufficient evidence that he was involved in the robbery. He states that he was never identified by any witness or the victim during trial. In his reply to Respondent's answer, Petitioner concedes that his claim is procedurally defaulted, but argues he is entitled to review under the actual innocence exception to the procedural bar (Doc. 14 at 3-5). Despite Plaintiff's concession that he

failed to exhaust his claim, this court will review the merits of the claim pursuant to 28 U.S.C. § 2254(b)(2).

To satisfy the constitutional requirement of due process in a criminal trial, the State must prove beyond a reasonable doubt every fact that constitutes an essential element of the crime charged against the defendant. In re Winship, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970). When considering the sufficiency of the evidence on review, the proper inquiry is not whether the reviewing court itself believes that the evidence established guilt beyond a reasonable doubt but "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979) (citation omitted); *see also* United States v. Thomas, 987 F.2d 697, 701 (11th Cir. 1993) (citations omitted); Bishop v. Kelso, 914 F.2d 1468, 1470 (11th Cir. 1990) (citation omitted). The reviewing court will not reweigh the evidence, but should view it in the light most favorable to the prosecution. Jackson, 443 U.S. at 319; Cosby v. Jones, 682 F.2d 1373, 1382 (11th Cir. 1982). Because jurors (or a judge, sitting as a trier of fact in a judge trial) are free to evaluate the credibility of testimony and the weight of the evidence, the court should assume that all conflicting inferences were resolved against the defendant. Wilcox v. Ford, 813 F.2d 1140, 1143 (11th Cir. 1987). "It is only where, after viewing the evidence in its most favorable light and making all credibility decisions in favor of the state the evidence still fails to at least preponderate in favor of the state, that we become concerned with conflicting inferences." Cosby, 682 F.2d at 1383 (footnote omitted).

To prove the crime of robbery with a firearm, the State must prove the following elements beyond a reasonable doubt:

    1. (Defendant) took the (money or property described in charge) from the person or custody of (person alleged).

    2. Force, violence, assault, or putting in fear was used in the course of the taking.

    3. The property taken was of some value.

    4. The taking was with the intent to permanently or temporarily [deprive (victim) of [his] [her] right to the property or any benefit from it] [appropriate the property of (victim) to [his] [her] own use or to the use of any person not entitled to it].

> " In the course of the taking" means that the act occurred prior to, contemporaneous with, or subsequent to the taking of the property and that the act and the taking of the property constitute continuous series of acts or events.
> . . . .
> In order for a taking of property to be robbery, it is not necessary that the person robbed be the actual owner of the property. It is sufficient if the victim has the custody of the property at the time of the offense.
> . . . .
> The taking must be by the use of force or violence or by assault so as to overcome the resistance of the victim, or by putting the victim in fear so that the victim does not resist. The law does not require that the victim of robbery resist to any particular extent or that the victim offer any actual physical resistance if the circumstances are such that the victim is placed in fear of death or great bodily harm if he or she does resist. But unless prevented by fear there must be some resistance to make the taking one done by force or violence.
> . . . .
> In order for a taking by force, violence, or putting in fear to be robbery, it is not necessary that the taking be from the person of the victim. It is sufficient if the property taken is under the actual control of the victim so that it cannot be taken without the use of force, violence, or intimidation directed against the victim.
> . . . .
> If you find that the defendant carried a firearm in the course of committing the robbery, you should find [him] [her] guilty of robbery with a firearm.

The Florida Bar 2002 Florida Standard Jury Instructions in Criminal Cases, Fourth Edition Part Two: Instructions on Crimes, Chp. 15 Robbery, para. 15.1 Robbery; Fla. Stat. § 812.13. Florida law also provides that a defendant may be found guilty on a principal theory of liability if the State proves the following elements beyond a reasonable doubt:

> If the defendant helped another person or persons [commit] [attempt to commit] a crime, the defendant is a principal and must be treated as if [he] [she] had done all the things the other person or persons did if
>
> 1. the defendant had a conscious intent that the criminal act be done and
> 2. the defendant did some act or said some word which was intended to and which did incite, cause, encourage, assist or advise the other person or persons to actually [commit] [attempt to commit] the crime.
>
> To be a principal, the defendant does not have to be present when the crime is [committed] [or] [attempted].

The Florida Bar 2002 Florida Standard Jury Instructions in Criminal Cases, Fourth Edition Part Two: Instructions on Crimes, Chp. 3 Final Charge to the Jury, para. 3.5(A) Principals; Fla. Stat. § 777.011.

The following evidence was presented at Petitioner's trial. James Jones, a stockman at the Suwannee Swifty store at the time of the robbery, testified as follows:

> Q. What's the first thing you remember happening regarding that incident?
>
> A. Well, the first thing I remember happening was -- that was unusual was there were two guys that entered the store and made a purchase. And then they came back a few minutes later and--
> . . . .
> A. And one had a tall Dr. Seuss-type hat on, some type of knit hat.
> . . . .
> Q. Could you describe the person who had the hat on as best as you recall?
>
> A. It was best I can recall he was a shorter guy about maybe 5'5" or 5'6".
>
> Q. Heavy, thin?
>
> A. Not heavy, I would say thin to medium.
>
> Q. Was he black or white?
>
> A. He was black.
>
> Q. Was he dark complected or light complected?
>
> A. Dark complected.
>
> Q. How about the other fellow that was with him?
>
> A. The other fellow was taller. He was thinner, a black jogging suit on, I think, with a pant leg--one pant leg was rolled up. And I figured he was probably 21 or 22, taller, thinner build.
> . . . .
> A. And this tall slender guy walks up to the counter. I guess he was going to pay for the soda, and that's when I heard the noise. And my coworker there,

Carswell, said–well he had his hands up in the air. And he said, don't shoot, just take the money, don't shoot.
. . . .
       Q.       And the guy with the hat on, where was he during this time?

       A.       He had to be at the front of the store because when I looked up he was reaching over--the shorter guy was reaching over the counter getting the money out of the cash register.
. . . .
       Q.       And this was the shorter guy with the hat on?

       A.       Yes.
. . . .
       Q.       Do you see anybody in the courtroom today that you remember being in the store that night and participating in the robbery?

       A.       I'm not sure, but there was a guy about this fellow's size, that gentleman there.

       Q.       Would it help if that gentleman stood up?

       A.       Yeah.

       MS. FREEMAN: Judge, I would ask that Mr. Ruffin stand up.

       A.       Yes. I remember--it was like he had this knit hat on. And it looks like him by the lower features of his face, about the same size.

BY MS. FREEMAN:
       Q.       But his head was covered up with a hat?

       A.       Yes.

       Q.       Could you describe the hat for us?

       A.       It looked like a Dr. Seuss knit-type hat from children's books.

       Q.       Was it, like, fitted to his head, or was it tall or--

       A.       I was tall and kind of over his eyes like--
. . . .
       A.       It was like a sweater cap, a knit skull cap type, but it was real high.

> Q. What color was it?  Do you recall?
>
> A. If I remember, it was red and white.
>
> Q. But it was clearly the shorter guy with the hat that resembles Mr. Ruffin who was reaching into the cash register?
>
> A. Yes, yes.

(Doc. 10, Ex. A-2 at 8-15).

Ginger Carter, Petitioner's former girlfriend, testified as follows:

> Q. Now, did you see Mr. Monts [the other participant in the robbery] back on that date [the date of the robbery]?
>
> A. Yes.
>
> Q. Where did you see him?
>
> A. He had came [sic] by the house [shared by Ms. Carter and Petitioner].
>
> . . . .
>
> Q. When he came over to your house that night, was Mr. Ruffin home?
>
> A. Yes.
>
> . . . .
>
> Q. Did Mr. Monts have anything with him?
>
> A. Yes.
>
> Q. What did he have?
>
> A. A gun.
>
> . . . .
>
> Q. Now, sometime during that evening did Mr. Ruffin and Mr. Monts leave the house by themselves?
>
> A. Yes.
>
> . . . .
>
> Q. When they got back to the house, did they tell you where they had been?
>
> A. Virgil [Monts] was talking, and he was saying something about a robbery.  But he didn't get enough money.  So they wanted to go do another one.

    Q.    Was Mr. Ruffin standing there when Mr. Monts was talking about the robbery?

    A.    Yes.

. . . .

    Q.    Did he indicate that Mr. Ruffin was also present there at the robbery?

    A.    He didn't mention it.

    Q.    Did Mr. Ruffin say anything about the robbery?

    A.    No.

    Q.    Did he indicate to you in any way that he had been at the robbery?

    A.    Not--he didn't actually state that.

    Q.    Did he say he wasn't there?

    A.    No.

. . . .

    A.    I just remember both of them coming in the house, and Virgil was rambling on about a robbery.

    Q.    Was he excited?  I mean, tell us how he was acting.

    A.    He just said--he's not like a very--he's a mellow person.  He doesn't like jump around and stuff.  But he was like just calmly talking but he was saying something about, man, we didn't get enough money.  We didn't get enough money.  And then they were talking.  He stated that he wanted to go and do another store because he didn't get enough money.

    Q.    He said, we didn't get enough money?

    A.    He himself stated, I.

    Q.    But you just said, we, that he said, we didn't get enough money.  Is that what you remember him saying?

    A.    He himself stated, I.

    Q.    Did he indicate in any way that Mr. Ruffin had been at that robbery?

        A.      (Shakes head.)

        Q.      Did Mr. Ruffin state anything during this conversation that he had not been at the robbery?

        A.      No, ma'am.

        Q.      When they came back, did they have any money with them?

        A.      I didn't see any.

        Q.      You didn't see any money. Did you see the gun?

        A.      Yes, ma'am.

(Doc. 10, Ex. A-2 at 19-25). After another witness testified, the prosecutor recalled Ms. Carter and questioned her as follows:

        Q.      Ms. Carter, do you know what a Dr. Seuss Hat is?

        A.      Yes, ma'am.

        Q.      Could you describe--did Mr. Ruffin have one of those?

        A.      Yes, ma'am.

        Q.      On the night that they left--Mr. Monts and Mr. Ruffin left in your mother's car, the night we've talked about today, did Mr. Ruffin have one of those hats with him?

        A.      Yes, ma'am.

        Q.      And did he have it on?

        A.      Yes, ma'am.

        Q.      Did he have it on when he came back?

        A.      Yes, ma'am.

(*id*. at 33).

Karen Brown, an investigator with the robbery task force of the local police department, testified as follows:

    Q.    Through your investigation, did Mr. Ruffin become a suspect?

    A.    Yes, ma'am, he did.

    Q.    At some point did you speak with Mr. Ruffin?

    A.    Yes, ma'am, I did.

. . . .

    Q.    Was Mr. Ruffin in custody?

    A.    Yes, ma'am, he was.

    Q.    Was he advised of his Miranda rights?

    A.    Yes, ma'am, he was.

    Q.    And did he waive his rights under Miranda?

    A.    Yes, ma'am, he did.

    Q.    Did he tell you anything about the robbery that had occurred on July 6, 1997 at 380 West Tharpe Street?

    A.    Yes, ma'am.

    Q.    Could you tell us what he told you about that robbery please.

    A.    He said that he had been involved in the robbery at Tharpe and M.L. King.

    Q.    Did he tell you whether there were any firearms or weapons involved?

    A.    Yes, ma'am, he told me that I could not charge him with armed robbery because he did not have the gun.

. . . .

    Q.    Now, did he say there wasn't a gun at all or that he didn't have the gun?

    A.    He said that he did not have the gun. He never said there was not a gun.

    Q.    But he did admit to being involved in the robbery?

      A.      Yes, ma'am, he did.

(*id.* at 34-37).

Robert Hamby, an officer with the Tallahassee Police Department, testified that he interviewed Chad Carswell, who was working as a clerk at the store during the robbery (*id.* at 28). He testified that Mr. Carswell was very upset, frightened, and appeared paranoid (*id.*). Officer Hamby testified that Carswell told him that one of the robbers pulled a firearm and reached across the counter attempting to take the money out of the cash register (*id.* at 29). Mr. Carswell described that suspect as 6'1", slim build, dark complected, light beard, thick mustache, wearing a black nylon jogging suit with one pant leg rolled up and a white cloth sun visor (*id.* at 30). He described the other suspect as 5'5" to 5'6", wearing a tall red Dr. Seuss-type hat with black rings around it, and a white T-shirt under a black nylon jogging suit (*id.* at 30-31). Mr. Carswell told Officer Hamby that the shorter subject just told the taller one to get some cigarettes (*id.* at 32).

Mr. Monts testified that he had entered a plea to armed robbery with regard to the robbery at the Suwannee Swifty store (*id.* at 47). He testified that he aimed a firearm at the clerk of the store during the robbery (*id.*). He also testified that he was not alone during the robbery--that a man known as "Craw" was with him (*id.*). Mr. Mont denied that he had been at Ginger Carter's house earlier in the evening on the night of the robbery (*id.*).

This evidence, when viewed in the light most favorable to the State, permitted any rational trier of fact to find beyond a reasonable doubt that Petitioner took money from the Suwannee Swifty store, or that he had the conscious intent that the robbery occur and did some act or said some word which was intended to or which did encourage or assist the other person to actually commit the robbery; that force or putting in fear was used in the course of the taking; that the taking was with the intent to permanently deprive the store of its right to the money; and that a firearm was carried during the course of committing the robbery. Thus, <u>any</u> rational trier of fact could have found the essential elements of robbery with a firearm beyond a reasonable doubt. Because Petitioner has failed to establish that the state court's convicting him of robbery with a firearm violated due process, he is not entitled to federal habeas relief.

Accordingly, it is respectfully **RECOMMENDED** that:

1.      The petition for writ of habeas corpus (Doc. 1) be **DENIED**.

Case No.: 4:05cv368/MMP/EMT

2. That any pending motions be **DENIED** as moot.

At Pensacola, Florida this 28<u>th</u> day of August 2006.

                                           /s/ *Elizabeth M. Timothy*
                                           **ELIZABETH M. TIMOTHY**
                                           **UNITED STATES MAGISTRATE JUDGE**

### NOTICE TO THE PARTIES

**Objections to these proposed findings and recommendations may be filed within ten (10) days after being served a copy thereof. <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u> A copy of objections shall be served upon the magistrate judge and all other parties. Failure to object may limit the scope of appellate review of factual findings.** *See* **28 U.S.C. § 636;** <u>United States v. Roberts</u>**, 858 F.2d 698, 701 (11th Cir. 1988).**